IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MEE DIRECT LLC, et al.** | * | |
| Plaintiffs | * | |
| v. | * | CIVIL No. JKB-13-455 |
| **TRAN SOURCE LOGISTICS, INC.,** et al., | * | |
| Defendants | * | |

## MEMORANDUM

Plaintiffs MEE Direct, LLC ("MEE Direct") and MEE Apparel, LLC ("MEE Apparel" and, collectively with MEE Direct, "Plaintiffs") brought this suit against Tran Source Logistics, Inc. ("Tran") and Howard Cates ("Cates" and, together with Tran, "Defendants") alleging the following four causes of action: (1) breach of contract against Tran; (2) unjust enrichment against Tran and Cates, (3) piercing the corporate veil against Cates; and (4) breach of fiduciary duty against Tran and Cates. Now pending before the Court are Cates's motion for partial summary judgment (ECF No. 41) and Plaintiffs' cross motion for summary judgment (ECF No. 42). The issues have been briefed and no hearing is required. Local Rule 105.6. For the reasons set forth below, Cates's motion will be GRANTED and Plaintiffs' motion will be GRANTED IN PART and DENIED IN PART.

### I. BACKGROUND[1]

MEE Direct and MEE Apparel are limited liability companies engaged in, respectively, the retail and wholesale sale of Marc Ecko-branded clothing. (ECF No. 1, Compl., at ¶ 1.) MEE

---

[1] The facts are recited here in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

1

Direct is organized under the laws of Delaware, and its sole member is Holton99, LLC a limited liability company organized under the laws of New Jersey. (ECF No. 13 at ¶ 2.) Holton 99, LLC, in turn, is owned by Seth Gerszberg, a citizen of New Jersey, and Holton 1, Inc., a corporation incorporated and with its principal place of business in New Jersey. (*Id.*) MEE Apparel is organized under the laws of New Jersey and shares MEE Direct's ownership structure. Tran is a Maryland corporation that provides transportation management services. (Compl. at ¶ 2.) Cates is the president of Tran and is a citizen of Pennsylvania. (*Id*. at ¶ 3.)

On June 29, 2009, Plaintiffs entered into a contract with Tran ("the Agreement") under which Plaintiffs retained Tran to provide certain transportation services in return for monthly payments. (ECF No. 41-3.) These services included collecting, reviewing, and auditing the invoices received from MEE's freight carriers, namely Federal Express, Argix, and UPS. (*Id*.; Compl. at ¶ 5.) The Agreement also provided that Tran would make payments to freight carriers on Plaintiffs' behalf "[a]fter receipt of funds sent or transferred to" Tran by Plaintiffs. (ECF No. 41-3.)

By 2011, Tran had failed to make payments of approximately $368,000 to Plaintiffs' freight carriers. (Compl. at ¶¶ 7-8; ECF No. 49-1 at 64-65; ECF No. 44-1.) Indeed, Tran used the funds transferred by Plaintiffs for "general corporate purposes," such as paying other customers' vendors and paying payroll, corporate debt, and other corporate expenses. (ECF No. 49-1 at 65.)

In 2007, when Cates took over Tran as its President and sole shareholder, Tran had a deficit of $800,000. (*Id.* at 49.) Tran's outgoing President, Mark Fetty, loaned the company approximately $100,000 to $150,000 upon his departure. In addition, from 2009 onward, Cates loaned Tran a total of over $110,000. (*Id.* at 39.) However, these loans were insufficient to

cover the amounts Tran owed to freight carriers. (*Id.* at 47, 51.) As a result, Tran was unable to pay all of its bills on time and began paying bills according to the "urgency of the situation" as funds came in from clients. (*Id.* at 51, 56, 57.) When Plaintiffs started making payments to Tran—including payments to cover invoices from freight carriers—those funds became part of Tran's general operating account—an account that was in deficit—and were used to pay Tran's most urgent bills. (*Id.* at 53.)

Defendants never disclosed Tran's dire financial status to Plaintiffs. (*Id.* at 61.) It was Cates's hope that Tran could use fees paid by Plaintiffs for invoice auditing and other transportation services in order to pay Plaintiffs' freight carrier bills. (*Id.*)

Since at least 2007, Tran has failed to make a profit. (*Id.* at 53.) Cates has not drawn a salary from Tran since 2007 though he has received payments for car, travel, and other business-related expenses. (*Id.* at 76.) Tran has also repaid some of Cates's loans, particularly where Cates had borrowed the money he had lent to the company and was required to make a payment on the debt. (*Id.* at 94-100.) In addition, Tran has made interest payments on the loan from Mark Fetty, although it has not made any such payments for approximately the past two years. (*Id.* at 68.)

Cates is Tran's only shareholder and its only director. (*Id.* at 16-18.) The corporation does not hold board meetings. (*Id.*) Tran has two employees, in addition to Cates. (*Id.* at 21.)

On August 13, 2012, Plaintiffs filed the present law suit in the Supreme Court of New York for the County of New York. (EECF No. 1 at 7.) On September 12, 2012 Defendants removed the case to the United States District Court for the Southern District of New York. (*Id.* at 1-5.) On December 26, 2012, it was transferred to this Court pursuant to 28 U.S.C. § 1406. (ECF No. 14 at 17.) Now pending before this Court are (1) Defendant Cates's motion for partial

summary judgment with regard to Count II-Unjust Enrichment, Count III—Piercing the Corporate Veil, and Count IV—Breach of Fiduciary Duty (ECF No. 41); and (2) Plaintiffs' cross-motion for summary judgment on all counts (ECF No. 42).

## II. LEGAL STANDARD

A party seeking summary judgment must show "that there is no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. FED. R. CIV. P. 56(e)(2). To carry these respective burdens, each party must support its assertions by citing specific evidence from the record. FED. R. CIV. P. 56(c)(1)(A). The court will assess the merits of the motion, and any responses, viewing all facts and reasonable inferences in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

## III. ANALYSIS

The Court will apply Maryland law in reviewing this motion to dismiss. This diversity action was transferred from the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1406. As a result, the Court will apply Maryland choice-of-law rules. *GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1084 (6th Cir. 1998) (When a case is transferred on . . . [the] basis [of 28 U.S.C. § 1406], the choice-of-law rules of the transfer*ee* court apply."); *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

The present action involves causes of action both in contract and in tort. With regard to the causes of action in contract, where, as here, a contract has no forum selection clause, Maryland's choice-of-law rule is one of *lex loci contractus.* Specifically,

[a]s to choice of law questions regarding contract issues, Maryland courts generally follow the lex loci contractus approach and thus hold that while the law of the forum governs the remedy for breach of contract, the law of the place of contracting governs questions regarding the nature, validity and construction of a contract unless such law would violate a strong public policy of Maryland.

*Guinness v. Ward*, 955 F.2d 875, 893 n.13 (4th Cir. 1992) (citations omitted). In turn, the "place of contracting" is the place where the last act necessary for the contract's formation is performed. *Grain Dealers Mut. Ins. Co. v. Van Buskirk*, 215 A.2d 467 (1965). Here, the place of contracting is Maryland and therefore, the Court will apply the substantive law of Maryland with regard to the causes of action in contract.[2]

With regard to the causes of action in tort, the Maryland choice-of-law rule is that of *lex loci delicti*. *See Hauch v. Connor*, 453 A. 2d 1207 (1983) ("The rule of *lex loci delicti* is well established in Maryland.") Here, the alleged torts occurred in Maryland, where Tran is incorporated and operates. Therefore the substantive law of Maryland will apply with regard to the causes of action in tort.

The Court further notes that both parties have implicitly recognized that the substantive law of Maryland applies to all the claims pending in this case by citing to Maryland law in their memoranda of law. Neither party has raised any objections to the Court applying Maryland law to this case.

  a. **Count I—Breach of Contract**

Plaintiffs seek summary judgment against Tran on Count I of their complaint, which alleges that Tran breached the Agreement. (Compl.) The Court finds that there is no genuine

---

[2] Surprisingly, the facts, as pled, do not allow the Court to determine that Maryland was the place of contracting. In fact, the parties to not discuss any choice of law issues. However, all parties cite to the substantive law of Maryland as controlling in this case. *(See, e.g.,* ECF No. 42 at 4 and ECF No. 45 at 3.) Therefore, the Court understands this to mean that all parties are in agreement (1) that Maryland is the place of contracting and (2) that the substantive law of Maryland applies with regard to all counts.

5

dispute as to any material fact and that Plaintiffs are entitled to judgment with regard to Count I as a matter of law.

Under the terms of the Agreement, Tran agreed that "after receipt of funds sent or transferred to [Tran], checks will be generated for disbursement of carrier payments." (ECF No. 41-3.) In his deposition, Cates admitted that Tran received approximately $368,000 from Plaintiffs to pay Plaintiffs' freight carriers but that the money was not paid to the carriers and was instead used for Tran's "general corporate purposes." (ECF No. 41 at 64-65.) Further, in a memorandum from Cates to Lisa Giunta, Plaintiffs' vice president of store operations, Cates stated that "[t]he approximate total amount owed to Ecko[, i.e. MEE,] vendors is $368,000." (*Id.*; ECF No. 44-1 at 2.)

Defendants cite to other parts of Cates's deposition to support their contention that "Cates . . . was unaware of any instances where carrier invoices were not paid. See Exhibit 2 p. 45:5-9." (ECF No. 45 at 3.) However, the cited testimony relates to non-payment of carrier invoices "when the company was under Fetty's control." (ECF No. 49-1 at 45.) Given that Cates took over control of the company from Fetty in 2007, these statements are inapposite to Plaintiffs' claim that Tran breached the June 29, 2009 Agreement.

The Court does take note of the fact that, in his deposition, Cates testified that Plaintiffs were sometimes tardy in transferring funds to Tran and that this made it difficult for Tran to pay invoices on time. (ECF No 49-1 at 62.) However Plaintiffs do not claim Tran breached the Agreement by making *late* payments to Plaintiffs' freight carriers. Rather, they claim that Tran *failed* to pay Plaintiffs' freight carriers $368,000 even after Plaintiffs had transferred the funds to Tran.

Given Cates's own admission that Tran never transferred the $368,000 it received to pay Plaintiffs' freight carriers, the Court shall enter judgment for Plaintiffs as to Count I in the amount of $368,000.

### b. Count II—Unjust Enrichment

Both Plaintiffs and Cates seek summary judgment on Count II, which alleges that Tran and Cates were unjustly enriched. (ECF No. 1.) The Court finds that there is no genuine dispute as to any material fact and that Cates is entitled to judgment with regard to Count II as a matter of law.

The Court begins by noting that "generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists." *Count Com'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 610 (Md. 2000). Here, the unjust enrichment claim against Tran fails because there is an express contract between Plaintiffs and Tran.[3] However, with regard to Cates himself, he was not a party to the Agreement between Plaintiffs and Tran. Therefore, the Court continues its analysis as to the unjust enrichment claim against Cates.

In Maryland, unjust enrichment has three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment." *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000).

Here, Cates did not receive any benefit directly from Plaintiffs. Indeed, the $368,000 at issue were paid directly to Tran. However, Plaintiffs claim that Cates received a benefit from

---

[3] An exception to this rule sometimes applies where there is "evidence of fraud or bad faith." *County Com'rs of Caroline County*, 747 A.2d 609. However, as discussed later in this memorandum, this exception does not apply in the case at bar.

7

them because Tran used Plaintiffs' funds for "general corporate purposes" including loan repayments to Cates and car allowance payments. (ECF No. 42 at 5; No. 49-1 at 64-65, 76, 94-100.)

Ultimately, however, these payments cannot satisfy the elements of unjust enrichment. Tran used the $368,000 from to pay various liabilities. While these included car allowance payments and loan repayments to Cates and Fetty, they also included vendor payments on behalf of other clients, salary payments to the company's other employees, and other expenses, such as rent. (ECF No. 49-1 at 65.) Further, the car allowance payments were made to Cates to cover expenses on behalf of the company. (*Id.* at 76-78.) Similarly, loan repayments to Cates seem to have been made in order to allow Cates to make payments on the credit card loans he took out to be able to lend money to Tran. (*Id.* at 99-100.) The Court also notes that since 2007 Cates has not drawn a salary from Tran. (*Id.* at 76.) As a result, the Court does not find that (1) a benefit was conferred upon Cates by Plaintiffs; or (2) that the acceptance or retention by the Cates payments he received from Tran were made under such circumstances as to make it inequitable for Cates to retain them. *Berry & Gould, P.A.* 757 A.2d at 113. Therefore the Court shall grant Cates judgment as to Count II.

### c. Count III—Piercing the corporate veil

Both Plaintiffs and Cates seek summary judgment on Count III, which alleges that Cates used Tran's corporate form in order to perpetrate fraud upon Plaintiffs and that Tran's corporate form should therefore be disregarded. (Compl.) The Court finds that there is no genuine dispute as to any material fact and that Cates is entitled to judgment with regard to Count III as a matter of law.

In Maryland, "the corporate entity will be disregarded only when necessary to prevent fraud or to enforce a paramount equity." *Stein v. Smith*, 751 A.2d 504, 510 (Md. 2000).

In order to show fraud, Plaintiffs must prove:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*VF Corp. v. Wrexham Aviation Corp.*, 715 A.2d 188, 193 (Md. 1998).

Plaintiffs assert that "Cates and Tran fraudulently induced MEE to enter into the Agreement in order to provide fresh liquidity for the Ponzi Scheme, knowing that Tran Source would be unable to satisfy its obligations." (ECF No. 42 at 7.) In particular, Plaintiffs allege that in the Agreement, Defendants represented that Plaintiffs' funds would be used exclusively to pay Plaintiffs' freight carriers.

The record is unambiguous as to the fact that Cates and Tran hoped that the Agreement with Plaintiffs would bring in much needed liquidity. Tran had outstanding liabilities of $800,000 and it depended on incoming funds to pay vendors. (ECF No. 49-1 at 51.) However, incoming funds were not sufficient to allow Tran to pay all its vendor bills on time. (*Id.* at 56.) As a result, Tran paid its bills as a function of the "urgency of the situation." (*Id.* at 57.) In essence this meant that Tran paid bills when vendors threatened to cut off service or to hold shipments. (*Id.*)

Cates very candidly admits that when Plaintiffs transferred funds to Tran, "they became part of the problem." (*Id.* at 53.) Those funds became part of an operating account that was in deficit and were used to pay the most urgent bills—and not necessarily Plaintiffs' bills. (*Id.*) However, as Cates has testified, he did not believe that this would prevent Tran from making

9

timely payments to Plaintiffs' freight carriers. (*Id.* at 61.) Specifically, Cates hoped that the fees paid by Plaintiffs for invoice auditing and other transportation services provided would provide a sufficient infusion of liquidity to allow Tran to meet payment deadlines.[4] (*Id.* at 61.)

As we now know, Cates was wrong. Tran failed to make $368,000 in payments to Plaintiffs' freight carriers. Further, each year since 2007, Tran has failed to make a profit—although it has succeeded in reducing its deficit. (*Id.* at 53-54.)

However, neither Tran nor Cates made any false representations to Plaintiffs. While it is true that Defendants did not inform Plaintiffs about their dire financial situation prior to signing the Agreement, Plaintiffs never inquired. (*Id.* at 58-62.) Further, contrary to Plaintiffs' claim, Defendants did not represent that Plaintiffs' funds would be used exclusively to pay Plaintiffs' freight carriers. The Agreement merely provides that "[Tran] agrees to: . . . after receipt of funds sent or transferred to [Tran], checks will be generated for disbursement of carrier payment." (ECF No. 41-3 at 2.) Nowhere does the agreement provide that the funds received from Plaintiffs have to be used exclusively to pay Plaintiffs' freight carriers. (ECF No. 48-1 at ¶ 3.) While the Agreement requires Tran to make a payment "after receipt of funds" it does not require (a) that Tran segregate and then use those funds and no other funds to make carrier payments or (b) that Tran segregate and then use those funds for no other purpose than to make Plaintiffs' carrier payments. Had Plaintiffs wanted Tran to hold its carrier payments in trust, in a segregated account, so that they could be used only to make Plaintiffs' carrier payment, Plaintiffs should have included such a requirement as part of the Agreement they negotiated with Tran.

Even if Defendants had made a false representation as to their ability to satisfy their contractual obligation to pay Plaintiffs' freight carriers upon receipt of funds, these representations would have been neither knowing nor made with a reckless disregard for the

---

[4] These fees included a $3,000/month flat fee plus an additional fee of 4 cents per invoice. (ECF No 41-3 at 3.)

truth. As Cates testified, Defendants believed they would be able to make timely payments to Plaintiffs' vendors using service fees collected from Plaintiffs. Accordingly, Plaintiffs have failed to show that they were defrauded by Cates.

Absent fraud, courts may disregard the corporate form in order to enforce a paramount equity. However, as the Court of Special Appeals has noted, "Maryland is averse to disregarding the entity shield in a business situation in the absence of fraud." *Serio v. Baystate Properties, LLC*, 60 A.3d 475, 488 (Md. App. 2013). "Because piercing the corporate veil is founded on equity, where no fraud is shown, the plaintiff must show that an inequitable result, involving fundamental unfairness, will result from a failure to disregard the corporate form." *Hildreth v. Tidewater Equipment Co, Inc.*, 838 A.2d 1204, 1210 (Md. 2003) (internal quotation omitted). Here, the Court finds no such fundamental unfairness. Although the record makes clear that Cates did not respect all the formalities of the corporate form and that he is both the sole shareholder and board member, there is no evidence that Cates has been treating the corporation's property as his own.

Therefore, this Court shall not disregard the corporate form and will grant Cates summary judgment as to Count III.

### d. Count IV—Breach of fiduciary duty

Both Plaintiffs and Cates seek summary judgment on Count IV, which alleges that Tran and Cates breached the fiduciary duties they had toward Plaintiffs. (Compl.) The Court finds that there is no genuine dispute as to any material fact and that Cates is entitled to judgment with regard to Count III as a matter of law.

The elements of breach of fiduciary duty in Maryland are not clearly established. Indeed, "[n]o Maryland appellate court has described the elements of breach of fiduciary duty because

11

'[t]here is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries.'" *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 685 (Md. App. 2012) (quoting *Wasserman v. Kay,* 14 A.3d 1193 (Md. App. 2011)). However, in *Kann v. Kann*, 690 A.2d 509, 521 (Md. 1997), the Maryland Court of Appeals held that, where a party alleges that another has breached a fiduciary duty:

> Counsel are required to identify the particular fiduciary relationship involved, identify how it was breached, consider the remedies available, and select those remedies appropriate to the client's problem. Whether the cause or causes of action selected carry the right to a jury trial will have to be determined by an historical analysis.

*Id.* at 521.

Here, Plaintiffs allege that when Plaintiffs transferred funds to Tran to pay Plaintiffs' shipping bills, Defendants assumed a fiduciary duty "in the same way as a trustee or an escrow agent would." (Compl. at ¶ 21.) However, the Agreement between Plaintiffs and Tran does not explicitly create such a relationship. Rather, the Agreement merely provides that "[Tran] agrees to: . . . after receipt of funds sent or transferred to [Tran], checks will be generated for disbursement of carrier payment." (ECF No. 41-3 at 2.) The Agreement does not provide that Defendants were to hold Plaintiffs' funds in trust nor does it even provide that Plaintiffs' funds were to be kept in a segregated account.

A fiduciary duty is an extraordinary duty that exceeds the duties parties to an arms-length contractual agreement generally owe each other. For example, a fiduciary is required to put the interests of the beneficiary ahead of his own if the need arises during the relationship. 37 Am. Jur. 2d Fraud and Deceit § 34. As a result, "before a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another or must enter into a relationship which imposes that undertaking as a matter of law." *Id.*

Here, the parties have not entered into a relationship which imposes a fiduciary duty as a matter of law. Also, the Agreement neither explicitly creates a fiduciary relationship nor did it put Defendants on notice that they were undertaking to act on behalf and for the benefit of Plaintiffs. Perhaps if the contract had required Tran to keep Plaintiffs' funds in a segregated account or imposed certain standards on how the funds were to be managed, the Court would have been inclined to read in an implied fiduciary duty. However, the facts simply do not establish that Defendants knowingly undertook a fiduciary duty nor do they show that Defendants entered into a relationship which imposes such a duty as a matter of law.

In addition, even if this Court were to find that Defendants owed Plaintiffs a fiduciary duty, breach of fiduciary duty is not a valid cause of action in Maryland. Indeed, "[i]n a claim for monetary damages at law, . . . an alleged breach of fiduciary duty may give rise to a cause of action, but it does not, standing alone constitute a cause of action." *George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay*, 14 A.3d 1193, 1219 (Md. App. 2011).

Therefore the Court shall grant Cates judgment as to Count IV.

IV. **CONCLUSION**

Accordingly, an order shall issue GRANTING Defendant Cates's motion for partial summary judgment (ECF No. 41) and GRANTING IN PART and DENYING IN PART Plaintiffs' cross motion for summary judgment (ECF No. 42).

Dated this 14th day of February, 2014.

BY THE COURT:

/s/
James K. Bredar
United States District Judge